**Slip Op. 13-80**

UNITED STATES COURT OF INTERNATIONAL TRADE

---

TAIAN ZIYANG FOOD                         :
   COMPANY, LTD., ET AL.,
                             :

            *Plaintiffs*,

                             :

     v.

                             :

UNITED STATES,                                          Consol. Court No. 05-00399

                             :

           *Defendant*,

                             :

      and

                             :

FRESH GARLIC PRODUCERS                    :
   ASSOCIATION, ET AL.,                   :

         *Defendant-Intervenors*.    :

---

[Sustaining U.S. Department of Commerce's third remand determination in administrative review of antidumping duty order covering fresh garlic from the People's Republic of China]

Dated:  June 24, 2013

Mark E. Pardo, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for Plaintiffs Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin Corporation, Ltd., Linshu Dading Private Agricultural Products Co., Ltd., and Sunny Import & Export Co., Ltd.

Richard P. Schroeder, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant.  With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was George Kivork, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

Michael J. Coursey, Kelley Drye & Warren, LLP, of Washington, D.C., argued for Defendant-Intervenors Fresh Garlic Producers Association, Christopher Ranch L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.  With him on the brief was John M. Herrmann.

# OPINION

RIDGWAY, Judge:

In this consolidated action, the plaintiff Chinese producers and exporters of fresh garlic challenged the final results of the U.S. Department of Commerce's ninth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China.  *See generally* Taian Ziyang Food Co. v. United States, 33 CIT ____, 637 F. Supp. 2d 1093 (2009) ("Taian Ziyang I"); Taian Ziyang Food Co. v. United States, 35 CIT ____, 783 F. Supp. 2d 1292 (2011) ("Taian Ziyang II").

Taian Ziyang I analyzed each of the 10 issues that the plaintiff Chinese producers raised, sustaining Commerce's determination as to three of the issues and remanding the remaining seven to the agency for further consideration.  *See generally* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1100-02, 1166.

Taian Ziyang II reviewed Commerce's remand determination (the Second Remand Determination), filed pursuant to Taian Ziyang I.  *See generally* Final Results of Redetermination Pursuant to Court Remand ("Second Remand Determination").[1]  As to four of the seven issues addressed therein, there were no objections.  Taian Ziyang II sustained the Second Remand Determination as to those four issues, and, upon analysis, remanded the other three to Commerce

---

[1]The Government was granted a voluntary remand at the outset of this action, to allow Commerce to correct its omission of certain data from its labor wage rate calculation.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1104.  The result of that voluntary remand was Commerce's First Remand Determination.  *See* Final Results of Redetermination Pursuant to Court Remand ("First Remand Determination").

for further consideration.  *See generally* <u>Taian Ziyang II</u>, 35 CIT at ____, ____, 783 F. Supp. 2d at 1302, 1343.

Now pending before the court is Commerce's Third Remand Determination, filed pursuant to <u>Taian Ziyang II</u>.  *See generally* Final Remand Results of Third Redetermination Pursuant to Remand ("Third Remand Determination").[2]  The Domestic Producers (*i.e.*, the Fresh Garlic Producers Association and its four constituent members[3]), defendant-intervenors in this action, challenge the Third Remand Determination as to two of the three issues addressed therein.  *See generally* Defendant-Intervenors' Comments on Third Remand Redetermination ("Def.-Ints.' Brief"); Defendant-Intervenors' Reply to Plaintiffs' and Defendant's Response Comments on Third Remand Redetermination ("Def.-Ints.' Reply Brief").  For their part, the Government and the four GDLSK Plaintiffs – *i.e.*, Zhengzhou Harmoni Spice Co., Ltd. ("Harmoni"), Jinan Yipin Corporation, Ltd. ("Jinan Yipin"), Linshu Dading Private Agricultural Products Co., Ltd. ("Linshu Dading"), and Sunny Import & Export Co., Ltd. ("Sunny") – urge that the Third Remand Determination be sustained in all respects.  *See generally* Defendant's Response to Comments Regarding Redetermination Pursuant to Court Remand ("Def.'s Response Brief"); GDLSK Plaintiffs' Response Comments Regarding the Department's Third Remand Redetermination ("Pls.' Response Brief").

---

[2]Throughout its Third Remand Determination, Commerce mistakenly refers to <u>Taian Ziyang II</u>, 35 CIT ____, 783 F. Supp. 2d 1292 (2011), as "<u>Taian Ziyang III</u>."  *See* Third Remand Determination at 1-2.

[3]The four constituent members of the Fresh Garlic Producers Association are Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[4]  For the reasons detailed below, Commerce's Third Remand Determination is sustained.

## I. Background

Seven Chinese producers and exporters of fresh garlic brought this action to contest various aspects of the Final Results of Commerce's ninth administrative review of the antidumping duty order on fresh garlic from China, which covered the period from November 1, 2002 through October 31, 2003.  *See generally* Taian Ziyang I, 33 CIT ____, 637 F. Supp. 2d 1093; Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 34,082 (June 13, 2005) ("Final Results"); Notice of Amended Final Results of Antidumping Duty Administrative Review: Garlic from the People's Republic of China, 70 Fed. Reg. 56,639 (Sept. 28, 2005) ("Amended Final Results"); Final Results of Redetermination Pursuant to Court Remand ("First Remand Determination").[5]

Taian Ziyang I analyzed each of the 10 issues that the Chinese producers raised, sustaining Commerce's determination as to three of the issues, and remanding the remaining seven to the agency for further consideration.  *See generally* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1100-02, 1166.  Specifically, Taian Ziyang I sustained Commerce's use of "adverse facts

---

[4]All citations to federal statutes are to the 2000 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2002 edition of the Code of Federal Regulations.

[5]In the Amended Final Results, Commerce corrected certain ministerial errors.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1103-04.  In addition, as explained in note 1 above, the First Remand Determination corrected Commerce's omission of certain data from its labor wage rate calculation.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1104; n.1, *supra*.

available" in calculating the dumping margins for Taian Ziyang Food Company, Ltd. ("Ziyang") and

Taian Fook Huat Tong Kee Foodstuffs Co., Ltd. ("FHTK").  *See id.*, 33 CIT at ____, ____, 637 F.

Supp. 2d at 1124, 1166.[6]  Taian Ziyang I similarly sustained Commerce's valuation of cold storage

(challenged by the GDLSK Plaintiffs), as well as Commerce's calculation of surrogate financial

ratios (challenged by Jinxiang Dong Yun Freezing Storage Co., Ltd. ("Dong Yun")).  *See id.*, 33 CIT

at ____, ____, 637 F. Supp. 2d at 1144, 1166.  In contrast, Taian Ziyang I remanded for further

consideration Commerce's valuation of certain "factors of production" necessary for the cultivation

and export of fresh garlic – in particular, (1) garlic seed, (2) irrigation water, (3) labor, (4) leased

land, (5) cardboard packing cartons, (6) plastic jars and lids, and (7) ocean freight.  *See id.*, 33 CIT

at ____, ____, ____, ____, ____, ____, ____, ____, 637 F. Supp. 2d at 1127, 1133, 1138, 1141,

1151-52, 1157, 1162, 1166.

       In its Second Remand Determination, Commerce revalued irrigation expenses, leased land,

ocean freight, and labor.  *See* Second Remand Determination at 1-2, 11-16, 16-40, 40-41, 50-53, 60-

73, 78-79.  On the other hand, Commerce continued to value garlic seed, cardboard packing cartons,

and plastic jars and lids as it had in the Final Results.  *See id.* at 1-2, 4-11, 41-46, 46-50, 54-60, 73-

76, 76-78.  As a result of its reconsideration in the course of the second remand, Commerce

recalculated the weighted-average antidumping duty margin for Harmoni as 0.00% (down from

8.79%), for Jinan Yipin as 1.04% (down from 13.21%), for Linshu Dading as 4.34% (down from

---

[6]The sole issue that Ziyang raised in this action was its challenge to Commerce's use of
"adverse facts available," which was resolved in favor of Commerce in Taian Ziyang I.  *See* Taian
Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1100-01, 1124.  Ziyang thus has had no stake
in the subsequent proceedings, and its dumping margin remains 12.58%.  *See* First Remand
Determination at 19.

7.97%), for Sunny as 4.22% (down from 9.17%), and for Dong Yun as 15.49% (down from 31.26%). *See id.* at 79; Final Results, 70 Fed. Reg. at 34,085; First Remand Determination at 19. FHTK's margin remained unchanged at 15.75%. *See* Second Remand Determination at 79; First Remand Determination at 19.[7]

Commerce's Second Remand Determination was the subject of <u>Taian Ziyang II</u>. *See generally* <u>Taian Ziyang II</u>, 35 CIT at ____, 783 F. Supp. 2d at 1292. As to four of the seven issues

---

[7]In addition to its challenge to Commerce's use of "adverse facts available" (which was resolved in the agency's favor in <u>Taian Ziyang I</u>, as discussed above), FHTK also contested the surrogate value that Commerce used for garlic seed, an issue that <u>Taian Ziyang I</u> remanded and Commerce's Second Remand Determination addressed. *See* <u>Taian Ziyang I</u>, 33 CIT at ____, 637 F. Supp. 2d at 1124-27; Second Remand Determination at 4-11. However, FHTK filed no comments on Commerce's draft Second Remand Determination; nor did FHTK comment on the Second Remand Determination that Commerce filed with the court. *See id.* at 3; <u>Taian Ziyang II</u>, 35 CIT at ____n.5, ____, 783 F. Supp. 2d at 1298 n.5, 1305. <u>Taian Ziyang II</u> subsequently upheld the Second Remand Determination as to the surrogate value for garlic seed. *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1302-05. Thus, as the Second Remand Determination indicates, FHTK's margin remains 15.75%; and FHTK had no stake in the most recent remand. *See* Second Remand Determination at 79.

Dong Yun initially contested four issues – the surrogate financial ratios that Commerce used, as well as the values used for land lease costs and irrigation expenses, and the wage rate. *See* <u>Taian Ziyang I</u>, 33 CIT at ____, 637 F. Supp. 2d at 1101. As discussed above, <u>Taian Ziyang I</u> sustained Commerce as to the surrogate financial ratios. *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1166. But the other three issues were remanded to Commerce. *See id.*, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1133, 1138, 1141. On remand, Commerce reconsidered its values for irrigation expenses and land lease costs, and the new values were sustained in <u>Taian Ziyang II</u>. *See* Second Remand Determination at 11-16, 40-41; <u>Taian Ziyang II</u>, 35 CIT at ____, ____, 783 F. Supp. 2d at 1305-08, 1310-11. Although the Second Remand Determination adhered to the wage rate methodology that Commerce had previously used, Dong Yun failed to file comments on the agency's draft remand results. *See* Second Remand Determination at 1-2, 3, 16-40. Nor did Dong Yun comment on the Second Remand Determination that Commerce filed with the court. *See* <u>Taian Ziyang II</u>, 35 CIT at ____ n.5, ____, 783 F. Supp. 2d at 1298 n.5, 1310. Thus, Dong Yun too had no stake in the most recent remand; and its margin remains 15.49%, as the Second Remand Determination indicates. *See* Second Remand Determination at 79.

(*i.e.*, the surrogate values for garlic seed, irrigation costs, land lease costs, and ocean freight expenses), there were no objections to the Second Remand Determination, and Commerce's determinations were sustained. *See generally id.*, 35 CIT at ____, ____, ____, ____, 783 F. Supp. 2d at 1305, 1308, 1311, 1343 (sustaining Second Remand Determination as to garlic seed, irrigation costs, land lease costs, and ocean freight expenses, respectively). However, the agency's treatment of the three remaining issues – *i.e.*, the surrogate value for cardboard packing cartons, the surrogate value for plastic jars and lids, and labor expenses – remained in dispute. In light of the GDLSK Plaintiffs' arguments and the Government's request for a voluntary remand, Taian Ziyang II once again remanded to Commerce the issue of labor costs. *See generally id.*, 35 CIT at ____, 783 F. Supp. 2d at 1310. Similarly, the issues of cardboard packing cartons and plastic jars and lids also were remanded to Commerce yet again. *See generally id.*, 35 CIT at ____, ____, 783 F. Supp. 2d at 1333, 1339 (remanding issues of cardboard packing cartons, and plastic jars and lids, respectively).

In its Third Remand Determination, Commerce has now revised its calculation of the labor rate in accordance with the agency's new methodology. *See* Third Remand Determination at 1, 4-11 (relying on Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 (June 21, 2011); also reconsidering valuation of labor data reflected in surrogate financial ratios, and concluding that no changes are necessary). In addition, to value cardboard packing cartons as well as plastic jars and lids for purposes of the Third Remand Determination, Commerce has implicitly adopted the fundamental reasoning of Taian Ziyang II and has therefore used the domestic Indian price quotes that the GDLSK Plaintiffs had

placed on the administrative record, in lieu of the Indian import statistics that the agency had relied

on in its prior determinations in this case.  *See* Third Remand Determination at 1, 3-4, 11.[8]  As a

result of these changes, the Third Remand Determination now calculates the margin for each of the

four GDLSK Plaintiffs (*i.e.*, Harmoni, Jinan Yipin, Linshu Dading, and Sunny) to be 0.0%.[9]

Although the Domestic Producers (*i.e.*, the Fresh Garlic Producers Association and its four

constituent members) filed no comments on either the draft or final versions of the Second Remand

Determination,[10] and although they filed no comments on the draft of the Third Remand

Determination which Commerce provided to them, the Domestic Producers nevertheless have filed

comments with the court objecting to the Third Remand Determination's use of price quotes in the

valuation of cardboard packing cartons and plastic jars and lids.  *See* Third Remand Determination

at 3 (stating that no party filed comments on draft of Third Remand Determination); *see generally*

Def.-Ints.' Brief; Def.-Ints.' Reply Brief.[11]  Specifically, the Domestic Producers argue that the

---

[8]The Third Remand Determination states that Commerce has decided to use the domestic price quotes "under protest."  *See* Third Remand Determination at 1, 3-4.  As explained in note 17 below, however, Taian Ziyang II did not impose any outcome or result on Commerce.  *See* n.17, *infra*.

[9]As noted above, Commerce already had previously calculated Harmoni's margin to be 0.00% in Commerce's Second Remand Determination.  *See* Second Remand Determination at 79.

[10]*See* Second Remand Determination at 3 (indicating that Domestic Producers filed no comments on draft of Second Remand Determination); Taian Ziyang II, 35 CIT at ____ n.5, 783 F. Supp. 2d at 1298 n.5 (noting that Domestic Producers filed no comments with court on Second Remand Determination); *see also id.*, 35 CIT at ____ n.24, 783 F. Supp. 2d at 1318 n.24 (noting Domestic Producers' failure to address valuation of plastic jars and lids in other prior stages of this proceeding); *id.*, 35 CIT at ____ n.44, 783 F. Supp. 2d at 1333 n.44 (noting Domestic Producers' failure to address valuation of cardboard packing cartons in other prior stages of this proceeding).

[11]Curiously, the Domestic Producers have not objected to Commerce's use of domestic Indian price quotes in valuing cardboard packing cartons and plastic jars and lids in Jinan Yipin, a

valuation of cardboard packing cartons and the valuation of plastic jars and lids must be remanded to Commerce for a third time, "with instructions [to] . . . provide a reasoned basis for its reliance on the price quotes" and to "identify substantial evidence in support of its determination."  Def.-Ints.' Brief at 3; Def.-Ints.' Reply Brief at 2.[12]

In contrast, the Government and the GDLSK Plaintiffs urge that the Third Remand Determination be sustained in all respects.  *See generally* Def.'s Response Brief; Pls.' Response Brief.

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Universal Camera Corp. v. Nat'l Labor

---

companion case involving the tenth administrative review of the antidumping duty order at issue in this action. *See* Jinan Yipin Corp. v. United States, No. 06-00189 (CIT filed June 5, 2006); Final Remand Results of Redetermination Pursuant to Second Remand at 6 (CIT filed March 29, 2012) (No. 06-00189) (noting that Domestic Producers' comments on draft remand results were limited to valuation of garlic bulb); *id*. at 23-24 (discussing agency's decision on remand to use domestic price quotes to value cardboard packing cartons, as well as plastic jars and lids); Defendant-Intervenors' Comments Regarding Second Remand Redetermination (CIT filed June 8, 2012) (No. 06-00189) (commenting only on valuation of garlic bulb).

[12]The Domestic Producers do not take issue with the Third Remand Determination's revised labor rate calculation. *See* Def.-Ints.' Brief at 2 n.2.

Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd.,

305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375,

1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of evidence "must take

into account whatever in the record fairly detracts from its weight," including "contradictory

evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones

Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera

Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).  That said, the mere

fact that it may be possible to draw two inconsistent conclusions from the record does not prevent

Commerce's determination from being supported by substantial evidence. Am. Silicon Techs. v.

United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n,

383 U.S. 607, 620 (1966).

Finally, while Commerce must explain the bases for its decisions, "its explanations do not

have to be perfect." NMB Singapore, 557 F.3d at 1319.  Nevertheless, "the path of Commerce's

decision must be reasonably discernable," to support judicial review. *Id*. (*citing* Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see generally* 19 U.S.C. §

1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the

basis for its determination").

## III.  Analysis

As Taian Ziyang II explained, dumping occurs when goods are imported into the United

States and sold at a price lower than their "normal value," resulting in material injury (or the threat

of material injury) to the U.S. industry.  *See* Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at

1299 (*citing* 19 U.S.C. §§ 1673, 1677(34), 1677b(a)); *see generally id.*, 35 CIT at ____, 783 F. Supp. 2d at 1299-1302.  The difference between the normal value of the goods and the U.S. price is the "dumping margin."  *See* 19 U.S.C. § 1677(35).  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset the dumping.  *See* 19 U.S.C. § 1673.

Normal value is typically calculated using either the price in the exporting market (*i.e.*, the price in the "home market" where the goods are produced) or the cost of production of the goods, when the exporting country is a market economy country.  *See generally* 19 U.S.C. § 1677b.[13] However, where – as here – the exporting country has a non-market economy ("NME"), there is often concern that the factors of production used to produce the goods at issue are under state control, and that home market sales may not be reliable indicators of normal value.  *See* 19 U.S.C. § 1677(18)(A).

In cases such as this, where Commerce concludes that concerns about the sufficiency or reliability of the available data do not permit the normal value of the goods to be determined in the typical manner, Commerce "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production," including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  *See* 19 U.S.C. § 1677b(c)(1); *see generally* Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009) (briefly

---

[13]In addition, in certain market economy cases, Commerce may calculate normal value using the price in a third country (*i.e.*, a country other than the exporting country or the United States). *See*, *e.g.*, RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1338 (Fed. Cir. 2002) (discussing 19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(1)(C)); *see also* Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1251 n.1 (Fed. Cir. 2009) (explaining exception).

summarizing "factors of production" methodology).[14]  The antidumping statute requires Commerce

to value factors of production "based on the *best available information* regarding the values of such

factors" in an appropriate surrogate market economy country – in this case, India.  *See* 19 U.S.C.

§ 1677b(c)(1) (emphasis added); *see also* <u>Shakeproof Assembly Components v. United States</u>, 268

F.3d 1376, 1382 (Fed. Cir. 2001); <u>Ningbo</u>, 580 F.3d at 1254 (emphasizing that statute mandates that

Commerce "shall" use "best available information" in valuing factors of production).

In determining which data constitute the "best available information," Commerce generally

looks to the criteria set forth in its "Policy Bulletin 04.1," also known as the "NME Surrogate

Country Policy Bulletin."  Policy Bulletin 04.1 explains:

> In assessing data and data sources, it is [Commerce's] stated practice to use
> investigation or review period-wide price averages, prices specific to the input in
> question, prices that are net of taxes and import duties, prices that are
> contemporaneous with the period of investigation or review, and publicly available
> data.

*See* Import Administration Policy Bulletin 04.1, "Non-Market Economy Surrogate Country

Selection Process," at "Data Considerations" (March 1, 2004)[15]; *see also* Second Remand

_____

[14]Factors of production "include, but are not limited to . . . hours of labor required, . . .
quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . .
. representative capital cost, including depreciation." *See* 19 U.S.C. § 1677b(c)(3); *see also* <u>Dorbest
Ltd. v. United States</u>, 604 F.3d 1363, 1367 (Fed. Cir. 2010) (discussing factors of production).

[15]As <u>Taian Ziyang II</u> explained, Policy Bulletin 04.1 clearly states that the five specified
criteria – *i.e.*, "investigation or review period-wide price averages, prices specific to the input in
question, prices that are net of taxes and import duties, prices that are contemporaneous with the
period of investigation or review, and publicly available data" – were developed to serve as a "tie-
breaker," if necessary, in Commerce's identification of a surrogate country.  *See* <u>Taian Ziyang II</u>,
35 CIT at ____ n.8, 783 F. Supp. 2d at 1300 n.8.  The criteria were not promulgated for the purpose
of guiding Commerce's selection from among alternative data sources *after* a surrogate country has
been identified.  *Id.*  Nevertheless, Commerce has used the criteria for that purpose here and in many

Determination at 42 (quoting Policy Bulletin and stating that it reflects agency's "well-established practice for determining the reliability and appropriateness of surrogate values").

Within this general framework, the statute "accords Commerce wide discretion in the valuation of factors of production in the application of [the statute's] guidelines." *See* <u>Shakeproof</u>, 268 F.3d at 1381 (internal quotation marks and citation omitted); *see also* <u>Ad Hoc Shrimp Trade Action Committee v. United States</u>, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (same); <u>Nation Ford Chem. Co. v. United States</u>, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (same). Commerce is recognized as the "master of antidumping law." *See* <u>Thai Pineapple Public Co. v. United States</u>, 187 F.3d 1362, 1365 (Fed. Cir. 1999); *see also* <u>Shakeproof</u>, 268 F.3d at 1381 (acknowledging "Commerce's special expertise"). And "[t]he process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise." *Id.*

Nevertheless, Commerce's discretion is not boundless.  In exercising its discretion, Commerce is constrained by the purpose of the antidumping statute, which is "to determine antidumping margins 'as accurately as possible.'" *See* <u>Shakeproof</u>, 268 F.3d at 1382 (*quoting* <u>Lasko Metal Products, Inc. v. United States</u>, 43 F.3d 1442, 1446 (Fed. Cir. 1994)). And, Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible." *See* <u>Nation Ford</u>, 166 F.3d at 1377 (internal quotation marks and citation omitted). Thus, "[i]n determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on *the best available information* and establishes antidumping margins *as accurately as possible*." *See* <u>Ningbo</u>, 580 F.3d

_____

other cases.  *Id.*

at 1257 (emphases added) (*quoting* Shakeproof, 268 F.3d at 1382) (internal quotation marks omitted).

In the present case, pursuant to the instructions in Taian Ziyang II, Commerce's Third Remand Determination reconsidered and revised the surrogate value for labor, as well as the surrogate values for cardboard packing cartons and plastic jars and lids. As discussed in greater detail below, all three revised determinations must be sustained.

A.   Surrogate Value for Labor

The antidumping statute provides that, in non-market economy cases such as this, the surrogate data used to calculate the value of factors of production must, to the extent possible, come from market economy countries that are at "a level of economic development comparable to that of the non-market economy country" at issue – in this case, China. *See* 19 U.S.C. § 1677b(c)(4)(A). The antidumping statute further provides that, in such cases, the surrogate data must, to the extent possible, come from market economy countries that are "significant producers of comparable merchandise." *See id.*

For most factors of production, Commerce typically uses values from a single market economy country (known as the "surrogate country" – here, India) that Commerce has determined to be both (a) economically comparable to the non-market economy country in question and (b) a significant producer of the goods at issue. *See* 19 C.F.R. § 351.408(c)(2). However, as Taian Ziyang I and Taian Ziyang II explained, Commerce in the past has treated the cost of labor quite differently than other factors of production. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1134; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1308; *see generally* Dorbest Ltd. v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

Concerned about "wide variances in wage rates between comparable economies," Commerce historically has valued the cost of labor in an NME country case by using a regression-based wage rate "reflective of the observed relationship between wages and national income in a variety of market economy countries." *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1134 (internal quotation marks and citations omitted). Thus, in the past, "[u]nlike its valuation of other factors of production in [a non-market economy country] case, Commerce [has based] its surrogate wage rate on data from a broad 'basket' of countries, and [has] not limit[ed] itself to market economy countries at a level of economic development comparable to the NME country in question." *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1134.

In the Final Results in this case, Commerce calculated the respondent Chinese producers' labor costs using the agency's standard regression-based wage rate calculation methodology, as set forth in the agency's regulations. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1134-35; 19 C.F.R. § 351.408(c)(3). After correcting several clerical errors in the initial calculations in the Final Results (which yielded a surrogate wage rate of $0.93), Commerce's First Remand Determination recalculated the applicable wage rate for this case at $0.85. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1135.

Relying heavily on Allied Pacific (which held Commerce's regulation to be inconsistent with the statute), Taian Ziyang I remanded the issue of the valuation of the labor factor of production to Commerce for further consideration. *See* Taian Ziyang I, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1134, 1135-36, 1138; Allied Pacific Food (Dalian) Co. v. United States, 32 CIT 1328, 1351-65, 587 F. Supp. 2d 1330, 1351-61 (2008). On remand, Commerce nevertheless continued to use a

regression-based methodology, albeit one that was slightly revised. *See generally* Second Remand Determination at 16-40, 60-73. The resulting calculation produced a surrogate wage rate of $0.77. *See id.* at 17 n.18.

In the meantime, however, the Court of Appeals handed down its decision in <u>Dorbest</u>, striking down Commerce's regulation as inconsistent with the plain language of the statute. *See generally* <u>Dorbest</u>, 604 F.3d at 1366, 1369-73. The Court of Appeals concluded that the agency's regulation "improperly require[d] using data from both economically comparable and economically dissimilar countries, and . . . improperly use[d] data from both countries that produce comparable merchandise and countries that do not." *See id.*, 604 F.3d at 1372 (discussing 19 C.F.R. § 351.408(c)(3)). The Government therefore sought a voluntary remand to allow Commerce to recalculate the surrogate value for labor expenses in a manner consistent with <u>Dorbest</u>, which <u>Taian Ziyang II</u> granted. *See generally* <u>Taian Ziyang II</u>, 35 CIT at ____, 783 F. Supp. 2d at 1310.

In the course of the most recent remand, Commerce reconsidered its approach to the calculation of surrogate values for labor expenses, in light of the Court of Appeals' decision in <u>Dorbest</u>, as well as the decision in <u>Shandong Rongxin</u>. *See* Third Remand Determination at 4-5; <u>Dorbest</u>, 604 F.3d at 1369-73; <u>Shandong Rongxin Import & Export Co. v. United States</u>, 35 CIT ____, ____, 774 F. Supp. 2d 1307, 1315-16 (2011). Concluding that "relying on multiple countries to calculate the wage rate is no longer the best approach," Commerce altered its methodology, to rely on industry-specific labor cost data from the primary surrogate country – in this case, India. *See* Third Remand Determination at 5; Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 (June 21, 2011).

As the Third Remand Determination observes, such an approach "is fully consistent with how [Commerce] values all other [factors of production], and results in the use of a uniform basis for [factor of production] valuation – a single surrogate country."  Third Remand Determination at 5.

For purposes of the Third Remand Determination here, Commerce relied on 2003 data (as reported in a 2005 publication of the International Labour Organization ("ILO")), because those data were "the most contemporaneous data that were available" between November 1, 2003 and September 3, 2005 – *i.e.*, "during the conduct of the underlying administrative review."  *See* Third Remand Determination at 6 (explaining, *inter alia*, that, on remand, agency placed on the record "additional industry specific labor cost data," and that agency used labor cost data for India "reported in the ILO Chapter 6A data").

Specifically, Commerce selected "the industry-specific Indian data that includes 'Processing and preserving of fruits and vegetables' (provided under Sub-Classification 15 'Manufacture of food products and beverages' of the International Standard Industrial Classification of all Economic Activities ('ISIC') Revision 3 standard)."  *See* Third Remand Determination at 7.  Commerce then "converted the hourly labor cost data, which was denominated in Indian Rupees, to U.S. dollars . . . based on the exchange rates in effect on the dates of the U.S. sales."  *Id*. at 6-7.  Using that methodology, Commerce calculated a revised labor rate of $0.51 per hour.  *Id*. at 7.

As noted above, neither the GDLSK Plaintiffs nor the Domestic Producers has objected to Commerce's revised wage rate calculation as set forth in the Third Remand Determination.  *See* Pls.' Response Brief at 6 (urging court to "affirm Commerce's Third Remand Determination" in its entirety); Def.-Ints.' Brief at 2 n.2 (advising that Domestic Producers "have no comments on the

analysis . . . regarding the surrogate valuation of labor"); *see also* Def.'s Response Brief at 11-12

(urging that Commerce's determination on labor expenses be sustained).  Commerce's determination

is accordingly sustained.

### B.  Surrogate Value for Cardboard Packing Cartons

In the Final Results in this case, Commerce valued the cardboard cartons that are used to

pack and ship garlic based on Indian import statistics taken from the World Trade Atlas for the

Indian tariff subheading 4819.1001, which covers cartons, boxes, and cases made of corrugated

paper and paperboard.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1144.  In so doing,

the Final Results rejected the other alternative source of data on the record – four domestic Indian

price quotes submitted by the GDLSK Plaintiffs, which were obtained within the period of review

(and within one week of one another) from four different Indian box vendors in four different cities,

for basic cardboard packing cartons like those used by the Chinese producers.  *See* Taian Ziyang II,

35 CIT at ____, 783 F. Supp. 2d at 1312.  The Final Results rejected the domestic price quotes

because they are not considered "publicly available information" and because, according to the Final

Results, they were not "representative" (that is, they assertedly did not reflect prices throughout the

period of review).  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1312; Policy Bulletin 04.1.

As Taian Ziyang I observed, however, although the price quotes are "not without problems,"

the Final Results significantly "overstated any potential concerns as to the reliability of the domestic

Indian box price quotes that the agency rejected, [and] significantly understated the patent flaws and

defects in the Indian import statistics on which the agency relied."  *See* Taian Ziyang I, 33 CIT at

____, ____, 637 F. Supp. 2d at 1144, 1151 (emphases omitted).  Detailing the numerous problems

with Commerce's calculus, <u>Taian Ziyang I</u> remanded the issue to the agency for further consideration.  *See generally id.*, 33 CIT at ____, 637 F. Supp. 2d at 1144-52.

Commerce's Second Remand Determination "add[ed] virtually nothing to this case" on the issue of the use of Indian import statistics *versus* domestic price quotes.  *See* <u>Taian Ziyang II</u>, 35 CIT at ____, 783 F. Supp. 2d at 1316; *see generally id.*, 35 CIT at ____, 783 F. Supp. 2d at 1316-33.  As <u>Taian Ziyang II</u> summed up the situation, the Second Remand Determination "[did] little more than rehash the exact same points that were made in the Final Results (and found wanting in [<u>Taian Ziyang I</u>])."  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1317.  Commerce yet again sought to exaggerate the alleged shortcomings of the domestic price quotes, while simultaneously ignoring the obvious (and admitted) problems inherent in the Indian import statistics on which the agency continued to rely.  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1316-33.

Noting that Commerce had seemingly chosen "*admittedly distorted* Indian import statistics over *potentially* '*perfect*' price quotes," <u>Taian Ziyang II</u> held that the Second Remand Determination "failed to adequately explain the agency's determination that the Indian import statistics constitute[d] the 'best available information' for use in calculating the surrogate value of basic cardboard packing cartons, in light of the acknowledged infirmities in the import statistics."  *See* <u>Taian Ziyang II</u>, 35 CIT at ____, ____, 783 F. Supp. 2d at 1327, 1332.  <u>Taian Ziyang II</u> similarly faulted Commerce for failing to "adequately explain[] why the Indian import statistics [were] preferable to the domestic price quotes, the other source of information on the existing record."  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1332.  <u>Taian Ziyang II</u> further held that "Commerce's determination that the Indian import statistics constitute the 'best available information' (as

compared to the domestic price quotes) is not supported by substantial evidence in the administrative record." *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1332.  The issue was therefore remanded once more, and the agency was cautioned not to simply recycle its earlier arguments, because the agency was "unlikely to get another bite at the apple."  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1333.[16]

Commerce's Third Remand Determination followed.  As to the surrogate value for cardboard packing cartons, Commerce implicitly adopted the fundamental reasoning of Taian Ziyang II (and, in turn, Taian Ziyang I).  The Third Remand Determination states:

> The Court found [in Taian Ziyang II] that Commerce had chosen "*admittedly distorted* Indian import statistics over *potentially* '*perfect*' price quotes."  While the Department disagrees with this conclusion, the Department is cognizant of the Court's admonition that the Department is not likely to "get another bite of the apple on this issue."  Accordingly, . . . the Department has determined, under protest, to use the price quote surrogate values provided on the record by the plaintiffs during the underlying proceeding for this final remand redetermination.  Using these price quotes, the surrogate value for cardboard boxes is 44.20 rupees per kilogram ("Rs/kg") . . . .

Third Remand Determination at 3-4 (footnotes omitted); *see also id*. at 1 (stating that Commerce "has applied, under protest, the price quotes . . . to value . . . cardboard cartons"); Pls.' Response Brief at 5-6 (stating that Third Remand Determination "accepted the Court's well-reasoned and clearly explained findings with respect to the available surrogate values" for cardboard packing

---

[16]Among other things, Taian Ziyang II instructed Commerce to reopen the administrative record on remand, to allow the submission of further "evidence concerning the domestic price quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate)." *See* Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1333; *see also id*., 35 CIT at ____, 783 F. Supp. 2d at 1339 (directing agency to reopen record on plastic jars and lids).  It is, however, undisputed that Commerce did not reopen the record.  *See* Third Remand Determination at 3-4 (stating that "rather than reopen the record, [Commerce] has determined, under protest, to use the price quote[s]").

cartons); Def.'s Response Brief at 9-11 (explaining that "the Remand Results are consistent with the Court's holding" in Taian Ziyang II, and that "[i]n light of the Court's concerns about the import statistics, . . . Commerce reasonably adopted plaintiffs' approach and used the domestic price quotes").[17]

Arguing that the Third Remand Determination "does not include further analysis or justification for [Commerce's] reliance on the price quotes submitted by the [GDLSK] Plaintiffs," the Domestic Producers characterize Commerce's use of the domestic price quotes as a "capitulation," and assert that the agency has failed to "provide a reasoned basis for its reliance on

_____

[17]The quoted language from the Third Remand Determination – particularly the phrase "under protest" – can be read to suggest that Taian Ziyang II imposed an outcome or result on Commerce, and ordered the agency to use the domestic price quotes in valuing cardboard packing cartons. Nothing could be further from the truth. See, e.g., Taian Ziyang II, 35 CIT at ____ n.45, 783 F. Supp. 2d at 1332 n.45 (noting that "[i]f Commerce could establish on remand that the inclusion of the more expensive products and the air freight charges have no significant distortive effect on the Indian import statistics, it might be possible to sustain the agency's determination that the import statistics constitute the 'best available information'"); id., 35 CIT at ____, 783 F. Supp. 2d at 1331 (suggesting that, on remand, Commerce address the "serious unanswered questions about the extent to which the import statistics are distorted by the inclusion of gift and speciality boxes . . . and about the extent to which the import statistics are distorted by the inclusion of charges for air freight"; suggesting that Commerce also consider obtaining evidence concerning the accuracy of the price quotes). In the course of the third remand, Commerce thus was free to use either the import statistics or the price quotes (or even some other data), provided that the agency properly articulated its rationale and supported its determination with substantial evidence.

The quoted language from the Third Remand Determination also reflects a fundamental error in logic. In the excerpt, Commerce first acknowledges that Taian Ziyang II cautioned that a *fourth remand* was unlikely; but then – rather than putting the *third remand* to good use through further analysis and/or eliciting additional evidence for the record – Commerce elected to adopt the domestic price quotes (in lieu of the Indian import statistics). See Third Remand Determination at 3-4. This is classic *non sequitur*. As a matter of logic, there is nothing about the low probability of a *fourth remand* that counsels a litigant not to avail himself of a *third remand*; indeed, one would reasonably expect the opposite. In other words, one would reasonably expect that a litigant who understands that he may have just "one last shot" to give it his "best shot."

the price quotes submitted by the Plaintiffs" and that use of the price quotes is not "supported by substantial evidence."  Def.-Ints.' Brief at 2-3; *see also* Def.-Ints.' Reply Brief at 2-4.

As discussed below, the Domestic Producers failed to exhaust their administrative remedies, and are therefore precluded from raising their arguments in this forum.  However, even if their arguments were considered on the merits, the Domestic Producers would not prevail.

### 1. Exhaustion of Administrative Remedies

The Government points out that the draft of the Third Remand Determination that Commerce provided to both the GDLSK Plaintiffs and the Domestic Producers was "materially identical" to the final version of the Third Remand Determination filed with the court, and thus reflected Commerce's decision to value cardboard packing cartons using the domestic price quotes (rather than the Indian import statistics).  *See* Def.'s Response Brief at 9; *see also id*. at 5, Tab A ("Draft Results of Third Redetermination Pursuant to Remand") at 3-4.  The Domestic Producers nevertheless failed to file any comments on the draft.  *See* Third Remand Determination at 3 (stating that Commerce received no comments on draft of Third Remand Determination); Def.'s Response Brief at 4-5, 7, 8; Pls.' Response Brief at 2, 3.  The Domestic Producers raised their objections to Commerce's use of the domestic price quotes for the first time in their opening brief filed with the court commenting on the Third Remand Determination.  *See* Def.-Ints.' Brief at 2-4; *see also* Pls.' Response Brief at 2.  The Domestic Producers thus failed to properly exhaust their administrative remedies.  *See* Def.'s Response Brief at 2, 6-9; Pls.' Response Brief at 2-5.

As a general matter, the doctrine of exhaustion holds that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (*quoting* McKart v. United

States, 395 U.S. 185, 193 (1969)) (internal quotation marks omitted).  Thus, it is a well-settled

principle of administrative law that "[a] reviewing court usurps the agency's function when it sets

aside [an agency] determination upon a ground not theretofore presented and deprives the [agency]

of an opportunity to consider the matter, make its ruling, and state the reasons for its action."

Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946); *see, e.g.*,

Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

The prescribed avenue for challenging remand results requires that a party first file

comments on the draft results at the administrative level, setting forth the party's objections.  *See*

Mittal Steel, 548 F.3d at 1383-84 (holding that party failed to exhaust administrative remedies by

not raising issue in comments on draft remand results);  AIMCOR v. United States, 141 F.3d 1098,

1111-12 (Fed. Cir. 1998) (same).  "If a party does not exhaust available administrative remedies,

'judicial review of [Commerce's actions] is inappropriate.'"  Consol. Bearings Co. v. United States,

348 F.3d 997, 1003 (Fed. Cir. 2003) (*quoting* Sharp Corp. v. United States, 837 F.2d 1058, 1062

(Fed. Cir. 1988)).  "'[T]he [Court of International Trade] generally takes a "strict view" of the

requirement that parties exhaust their administrative remedies.'"  Yangzhou Bestpak Gifts & Crafts

Co. v. United States, ____ F.3d ____, ____, 2013 WL 2150836 * 10 (Fed. Cir. 2013) (*quoting* Corus

Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (citations omitted)).

Requiring exhaustion even in a discretionary, non-jurisdictional context is generally sound

policy, because it allows the agency to apply its expertise, to correct its own mistakes, and to

compile an adequate record to support judicial review, advancing the dual purposes of protecting

agency authority and promoting judicial efficiency.  *See* Woodford v. Ngo, 548 U.S. 81, 89 (2006)

(discussing two main purposes of doctrine of exhaustion, *i.e.*, protecting "administrative agency

authority" and promoting judicial economy); Richey v. United States, 322 F.3d 1317, 1326 (Fed.

Cir. 2003) (same).    Accordingly, in actions challenging determinations in antidumping

administrative reviews, the Court of International Trade requires litigants to exhaust administrative

remedies "where appropriate."  28 U.S.C. § 2637(d); *see also* Corus Staal, 502 F.3d at 1379 (stating

that 28 U.S.C. § 2637(d) "indicates a congressional intent that, absent a strong contrary reason,"

court should require exhaustion of administrative remedies); McCarthy v. Madigan, 503 U.S. 140,

144 (1992) (explaining that, even "where Congress has not clearly required exhaustion, sound

judicial discretion governs").

　　　In this case, the policy considerations that underpin the doctrine of exhaustion cut squarely

against the Domestic Producers.[18]  Because the Domestic Producers failed to assert their objections

---

[18]There are a limited number of narrow exceptions to the requirement that a party exhaust its administrative remedies.  *See, e.g.*, 5 J. Stein, G. Mitchell, & B. Mezines, *Administrative Law* § 49.02, at 49-47 (2012) (summarizing exceptions to requirement of exhaustion, including inadequacy of administrative remedy, impending irreparable harm, *ultra vires* agency action, futility, and pure legal question); *see also* 2 R. Pierce, *Administrative Law Treatise* §§ 15.2-15.8, 15.10 (5th ed. 2010) (summarizing doctrine of exhaustion and discussing exceptions); 4 C. Koch, *Administrative Law and Practice* § 12:22 (3d ed. 2010) (discussing exceptions); SeAH Steel Corp. v. United States, 35 CIT ____, ____, 764 F. Supp. 2d 1322, 1325-26 (2011) (summarizing exceptions); Corus Staal BV v. United States, 30 CIT 1040, 1050 n.11 (2006), *aff'd* 502 F.3d 1370 (Fed. Cir. 2007) (same); Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT 627, 645 n.18, 342 F. Supp. 2d 1191,1206 n.18 (2004) (same).

　　　However, the Domestic Producers do not seek to claim the benefit of any of the established exceptions.  *See* Recording of Oral Argument at 10:00-10:20 (Domestic Producers' counsel advising that Domestic Producers do not invoke any exception to requirement of exhaustion); Pls.' Brief at 4-5 (noting that Domestic Producers "make no effort to argue that any exception to the exhaustion doctrine applies").  Nor do the facts suggest that the Domestic Producers could avail themselves of

to Commerce's use of domestic price quotes to value cardboard packing cartons by filing comments on the draft of the Third Remand Determination, the agency was not put on timely notice of the Domestic Producers' objections.   The Domestic Producers thus deprived Commerce of the opportunity to address the Domestic Producers' concerns (by, for example, elaborating on the agency's rationale for relying on price quotes, rather than import statistics, to value cardboard packing cartons, and detailing the record evidence supporting the agency's determination).   *See* Def.'s Response Brief at 7, 8-9; Pls.' Response Brief at 3-4.

In sum, because the Domestic Producers failed to timely raise their objections at the administrative level, they cannot now be heard to criticize the Third Remand Determination's use of domestic price quotes to value cardboard packing cartons.   By their silence, the Domestic Producers waived their right to press that issue in this forum.   *See* AIMCOR, 141 F.3d at 1111-12.

---

any of the recognized exceptions.  *See* Def.'s Response Brief at 8-9 (explaining that "none of the very limited exceptions to the exhaustion doctrine apply" here); Pls.' Response Brief at 4 (same). Instead, the Domestic Producers argue that the exhaustion requirement has no application in this situation, because – the Domestic Producers contend – the gravamen of their objections is that the Third Remand Determination does not satisfy the standard of review and does not comply with the terms of the remand set forth in Taian Ziyang II.  *See* Def.-Ints.' Reply Brief at 2-3.  Thus, for example, the Domestic Producers assert that "even if [the Domestic Producers] had filed no comments [with the court] on the Third [Remand] Determination, this Court would be required to find that the redetermination is supported by substantial evidence in order to sustain it."  *Id*. at 2. It is telling, however, that the Domestic Producers cite no authority for the proposition that they advance.   And it is not at all clear that a court is required to determine whether an agency determination that is not (properly) in dispute is supported by substantial evidence and is otherwise in accordance with law.   It is generally the case that, when remand results are filed with the court and no party submits comments, the court simply enters an order noting the fact and sustaining the remand results – without making any findings.  In short, there is no merit to the Domestic Producers' claim that they were not required to exhaust administrative remedies by raising their objections at the administrative level.  But, in any event, as outlined more fully below, Commerce's Third Remand Determination in fact does comply with the remand instructions in Taian Ziyang II and satisfies the applicable standard of review.

## 2. The Sufficiency of Commerce's Rationale

Even if the Domestic Producers' challenges to the Third Remand Determination's valuation of cardboard packing cartons were not barred by the doctrine of exhaustion, they would nevertheless gain no purchase.

The Domestic Producers first contest the sufficiency of Commerce's rationale, asserting that the Third Remand Determination lacks "a reasoned basis for [the agency's] reliance on the price quotes submitted by the [GDLSK] Plaintiffs" in lieu of the Indian import statistics used in the agency's previous determinations. Def.-Ints.' Brief at 3; *see generally id*. at 2-4; Def.-Ints.' Reply Brief at 2-4. The Domestic Producers point to the summary nature of the section of the Third Remand Determination that addresses the valuation of cardboard packing cartons, contrasting the relative brevity of that section with Commerce's "lengthy discussion and analysis" of the agency's revised wage rate methodology. *See* Def.-Ints.' Brief at 2-3. The Domestic Producers argue that the court's "comprehensive and detailed opinion[s]" in this matter "set out an analytical framework for the agency." *See* Def.-Ints.' Reply Brief at 3. But, according to the Domestic Producers, "[r]ather than undertaking this analysis," Commerce effectively abdicated its decisionmaking role, stating "simply" that it had "determined, under protest, to use the price quote surrogate values provided on the record." *See id*. (*quoting* Third Remand Determination at 3); *see also id*. at 3-4.[19]

---

[19]The Domestic Producers further argue:

While this Court's prior opinions set out an analytical framework that could be applied by [Commerce] in relying on a different surrogate value for cardboard cartons . . . , [Commerce] did not apply that framework. Rather, [Commerce] indicated that 'under protest' it would rely upon the price quotes submitted by the

As the Court of Appeals for the D.C. Circuit has explained, the requirement that an agency articulate the rationale for its determinations "is inherent in the doctrine of judicial review which places only limited discretion in the reviewing court." WAIT Radio v. FCC, 418 F.2d 1153, 1156 (D.C. Cir. 1969).  However, even where an agency's findings "could have been more explicit" and its analysis of the reasons for its findings "could have been more detailed," judicial review "does not demand expansive discussion or rigid adherence to [any] specific formula." Nucor Corp. v. United States, 414 F.3d 1331, 1339 (Fed. Cir. 2005).  "[B]usy agency staffs are not expected to dot 'i's and cross 't's.'" WAIT Radio, 418 F.2d at 1156.  In evaluating the sufficiency of an agency's rationale, courts "recognize the presumption of regularity" and "adhere to 'salutary principles of judicial restraint.'" Id. (citing and quoting Braniff Airways, Inc. v. CAB, 379 F.2d 453, 460, 463 (D.C. Cir. 1967)).  Thus, there is no "quantifiable formula for deciding when an agency . . . has crossed the line from the tolerably terse to the intolerably mute." Id., 418 F.2d at 1157.  "Courts are indulgent toward administrative action to the extent of affirming [a determination] where the agency's path can be 'discerned' even if the [determination] 'leaves much to be desired.'" Id., 418 F.2d at 1156 (quoting Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945)).

The agency determination at issue here may be "tolerably terse"; but it cannot be said to be "intolerably mute."  It is true that – as the Domestic Producers contend – the Third Remand Determination "did not state in so many words" that Commerce was adopting the rationale set forth

---

Plaintiffs, and failed to provide an analysis for that determination that demonstrates that it is supported by substantial evidence.

Def.-Ints.' Reply Brief at 3-4 (citing Third Remand Determination at 3-4).

in <u>Taian Ziyang I</u> and <u>Taian Ziyang II</u>.  *See* <u>Nucor Corp.</u>, 414 F.3d at 1339.  That is nevertheless "the

plain import" of Commerce's statement.  *Id.*  As the GDLSK Plaintiffs explain, Commerce "fully

explained its decision when it referenced <u>Taian Ziyang II</u> and then stated it had determined 'to use

the price quote surrogate values provided on the record by the plaintiffs.'"  Pls.' Response Brief at

5; *see also id.* at 5-6 (stating that Third Remand Determination "accepted the Court's well-reasoned

and clearly explained findings with respect to the available surrogate values" for cardboard packing

cartons); Def.'s Response Brief at 9-11 (same).   "Where an agency has not made a particular

determination *explicitly*, the agency's ruling nonetheless may be sustained as long as 'the path of

the agency may be reasonably discerned.'"   <u>Nucor Corp.</u>, 414 F.3d at 1339 (*quoting* <u>Ceramica</u>

<u>Regiomontana, S.A. v. United States</u>, 810 F.2d 1137, 1139 (Fed. Cir. 1987), *quoting* <u>Bowman</u>

<u>Transportation, Inc. v. Arkansas-Best Freight System, Inc.</u>, 419 U.S. 281, 286 (1974)) (emphasis

added); *see also* <u>Wheatland Tube Co. v. Dongbu Steel Co.</u>, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998)

(stating that "[a]n *explicit* explanation is not necessary . . . where the agency's decisional path is

reasonably discernible"; "Although Commerce did not explain [its rationale] directly . . . , its

decisional path . . . is readily apparent") (emphasis added).   In this case – as in <u>Nucor</u> – "the

agency's path is clear, even though it did not set forth its conclusion . . . explicitly."  <u>Nucor Corp.</u>,

414 F.3d at 1339.

To be sure, Commerce's reasoning in the section of the Third Remand Determination on

cardboard packing cartons "is not a paragon of clarity."  *See* <u>Bowman Transportation</u>, 419 U.S. at

290.  Had Commerce spelled out its rationale "in a more considered manner . . . , [judicial] review

would have been greatly facilitated" – and it is possible that the need for such review might even

have been obviated entirely. *Id.* And yet, "[w]hile a more substantial explanation from Commerce might have been helpful to [the court] or preferable to [the Domestic Producers], its absence . . . is not grounds for [reversal]," where – as here – it is possible to "reasonably discern the path of Commerce's decision." NMB Singapore, 557 F.3d at 1323.

This is not a case where it is necessary to try to "guess" at the reasoning underlying Commerce's determination. *See*, *e.g.*, SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947) (stating that "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action"); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C. Cir. 1970) (explaining that court "must not be left to guess as to the agency's findings or reasons"). The Domestic Producers do not profess to harbor any doubts as to Commerce's rationale for adopting the domestic price quotes to value cardboard packing cartons. Nor could the Domestic Producers credibly make such a claim. The Domestic Producers' argument thus seeks to elevate form over substance.

Moreover, this is not a case where the court is improperly "supply[ing] a reasoned basis for the agency's action that the agency itself has not given." *See* State Farm, 463 U.S. at 43 (*citing* Chenery, 332 U.S. at 196). Quite to the contrary, it is Commerce that has implicitly adopted – and incorporated by reference into the Third Remand Determination – the court's analysis of the relative merits of the Indian import statistics and the domestic price quotes, as set forth in detail in Taian Ziyang I and Taian Ziyang II. *See* Third Remand Determination at 3-4; *see generally* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1144-52; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1311-33.

Nor is this a case where the record would admit of multiple possible rationales for the agency's action. *See* Rogers Radio Communications Services, Inc. v. FCC, 751 F.2d 408, 418 (D.C. Cir. 1985) (remanding issue to agency where, *inter alia*, record revealed several potential bases for agency's action, leaving court "unable to clearly discern the agency's path").  As summarized in section III.B.3 below, and as set forth in greater detail in Taian Ziyang I and Taian Ziyang II, the administrative record on this issue reflects candid admissions by Commerce as to at least two significant flaws in the Indian import statistics that the agency previously used to value cardboard packing cartons, while – at the same time – the record is utterly devoid of evidence that the domestic price quotes are in any way unreliable.  Accordingly, particularly when the Third Remand Determination is read in the context of the administrative record as a whole,[20] there is zero

---

[20]In attempting to discern an agency's path of decisionmaking, a court is not confined solely to the text of the agency's stated rationale.  Thus, for example, the court may also consider the administrative record in the proceeding at issue, and even documents from other proceedings. *See*, *e.g.*, United Parcel Service, Inc. v. U.S. Postal Service, 184 F.3d 827, 840 (D.C. Cir. 1999) (explaining that, in Direct Marketing Association, "as in the instant case, the [agency's] approach was '*discernable from the evidentiary record* upon which the recommendation [was] based'") (*quoting* Direct Marketing Ass'n v. U.S. Postal Service, 778 F.2d 96, 111 (2d Cir. 1985) (emphasis added)); Direct Marketing Ass'n, 778 F.2d at 108 (concluding that agency's rationale was "a reasonable one which can be 'clearly discerned,' *from the record hearings*") (*quoting* Bowman Transportation, 419 U.S. at 286) (emphasis added); Rogers Radio, 751 F.2d at 418 (concluding that court could not "clearly discern the agency's path *from the several opinions below and the voluminous record itself*") (emphasis added); Alaska Dep't of Environmental Conservation v. EPA, 540 U.S. 461, 497 (2004) (holding rationale for agency's "skeletal" orders to be sufficient when "read together with *accompanying explanatory correspondence*") (emphasis added); New Jersey Zinc Co. v. FERC, 843 F.2d 1497, 1500-01 (D.C. Cir. 1988) (Bader Ginsburg, J.) (finding agency rationale sufficient when read in light of order in prior case).

Accordingly, in seeking to discern the path of Commerce's reasoning in adopting the domestic price quotes to value cardboard packing cartons, the inquiry need not begin and end with the Third Remand Determination itself.  Instead, it is permissible to read Commerce's statements in light of the entirety of the administrative record compiled by the agency, and the opinions of the

uncertainty concerning the bases for Commerce's ultimate decision to rely on the domestic price quotes (rather than the import statistics).

Under these circumstances, it would serve little purpose to remand this action to seek to compel Commerce to expressly state that which the Third Remand Determination indisputably implies. The Domestic Producers' challenge to the sufficiency of Commerce's rationale for use of the domestic price quotes must be rejected.

### 3. The Substantiality of the Evidence

Apart from their challenge to the sufficiency of Commerce's rationale for using the domestic price quotes to value cardboard packing cartons (discussed immediately above), the Domestic Producers also argue that the agency's decision to use the price quotes is not supported by substantial evidence. *See* Def.-Ints.' Brief at 3-4; Def.-Ints.' Reply Brief at 2, 4. The Domestic Producers fare no better on this claim. *See generally* Pls.' Response Brief at 5-6; Def.'s Response Brief at 9-11.

As summarized below, and as set forth at length and in exhaustive detail in Taian Ziyang I and Taian Ziyang II, the record evidence – viewed through the lens of Commerce's criteria in Policy Bulletin 04.1 – weighs solidly in favor of the price quotes. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1144-52 (analyzing merits of domestic price quotes *versus* Indian import statistics for valuation of cardboard packing cartons); Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1311-33 (same); section III, *supra* (in the introductory section, discussing criteria established in Policy

---

court (which were referenced in the Third Remand Determination itself).

Bulletin 04.1, including "product specificity," "contemporaneity," "representativeness," and "public availability," in addition to whether prices are "net of taxes and import duties").

As Taian Ziyang II explained, of the five criteria set forth in Policy Bulletin 04.1, "product specificity" logically must be the most important. *See* Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1330.[21]  And it is undisputed that, as discussed in Taian Ziyang I and Taian Ziyang II, the four domestic price quotes on the record of this proceeding are highly "specific to the input in question" – that is, the cardboard packing cartons actually used by the Chinese producers.  *See* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1144, 1152; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1312; *see also* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1151.

The undisputed record evidence similarly establishes that the four domestic price quotes are, in the words of Policy Bulletin 04.1, fully "contemporaneous with the period of . . . review."  *See* Taian Ziyang I, 33 CIT at ____, ____ & n.57, ____, 637 F. Supp. 2d at 1144, 1145 & n.57, 1146;

---

[21]To underscore the significance of this point, Taian Ziyang II took it to its logical extreme:

> To illustrate . . . , Commerce here could not reasonably base its surrogate value for cardboard packing cartons on Indian import statistics for fishing rods (for instance), even if those import statistics – in the words of Policy Bulletin 04.1 – unquestionably reflected "review period-wide price averages" and were indisputably "publicly available data" that were fully "contemporaneous with the period of . . . review" and "net of taxes and duties."  Commerce could not do so because, even if the Indian import statistics for fishing rods were absolutely perfect in every other way, the import statistics would not be sufficiently "product specific."

Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1330 (footnote omitted).  If a set of data is not sufficiently "product specific," it is of no import whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1.  *See, e.g.,* Hebei Metals & Minerals Import & Export Corp. v. United States, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1273-74 (2005) (explaining that, where agency failed to demonstrate that import statistics were sufficiently "product specific," it was irrelevant whether statistics satisfied other criteria).

Taian Ziyang II, 35 CIT at ____, ____, ____, 783 F. Supp. 2d at 1312, 1316-17, 1326.[22]

In its determinations in this proceeding prior to the Third Remand Determination, the reservations expressed by Commerce have focused exclusively on the "representativeness" and "public availability" of the price quotes. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1145-47; Taian Ziyang II, 35 CIT at ____, ____, ____, 783 F. Supp. 2d at 1312, 1316, 1318-23. But, as documented in Taian Ziyang I and Taian Ziyang II, those concerns lacked any basis in the evidence on the record of this proceeding.

Like "contemporaneity," Commerce's "representativeness" criterion relates to the timing of price information. In contrast to the contemporaneity criterion (which concerns whether the price information is from within the review period at issue), the focus of the representativeness criterion is on whether the information reflects "review period-wide price averages," rather than prices for a more limited period of time. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1145; Taian Ziyang II, 35 CIT at ____, ____, 783 F. Supp. 2d at 1312-13, 1320. Commerce's concern about price quotes for a more limited period of time – like the price quotes at issue here, which were all dated within a week of one another – is the possibility that the pricing information may be distorted (and therefore unreliable) due to "temporary market fluctuations." *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1145; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1312-13. However, as Taian Ziyang I and Taian Ziyang II noted, the administrative record in this proceeding is barren of any evidence whatsoever that might suggest that prices for cardboard packing cartons

---

[22]Although there was some confusion concerning the contemporaneity of the domestic price quotes, the record establishes that all four are fully contemporaneous (*i.e.*, from within the period of review). *See* Taian Ziyang I, 33 CIT at ____ n.57, 637 F. Supp. 2d at 1145 n.57; Taian Ziyang II, 35 CIT at ____ & n.21, 783 F. Supp. 2d at 1316 & n.21.

are subject to any significant volatility.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at

1146; Taian Ziyang II, 35 CIT at ____ n.28, ____, 783 F. Supp. 2d at 1321 n.28, 1321-23.[23]

The record is equally definitive on "public availability."  As Taian Ziyang I observed, there

is room for debate as to the precise meaning of "public availability."  *See generally* Taian Ziyang

I, 33 CIT at ____, 637 F. Supp. 2d at 1146.  But there is no question that the focus of Commerce's

concern about information that is not publicly available is the potential for manipulation.  *See id*.,

33 CIT at ____, 637 F. Supp. 2d at 1146; Taian Ziyang II, 35 CIT at ____, ____, 783 F. Supp. 2d

at 1312, 1318.  And it is undisputed that there is not even a scintilla of evidence on the record here

to suggest that the four price quotes are in any way the product of manipulation or distortion, or

tainted by collusion.  No evidence whatsoever.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp.

2d at 1146-47; Taian Ziyang II, 35 CIT at ____, ____, 783 F. Supp. 2d at 1312, 1318.[24]

---

[23]As Taian Ziyang II noted, the suggestion that prices for cardboard packing cartons are
subject to any significant fluctuation "does not . . . necessarily comport with common sense."  Taian
Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1322.  Taian Ziyang II further explained:

> [I]t seems reasonable to assume that some commodities (or factors of production)
> fluctuate in price, seasonally and/or in response to established market forces such as
> supply and demand.  It is common knowledge, for example, that agricultural produce
> prices generally tend to fluctuate based on seasonal availability, and that mineral
> prices may fluctuate in accordance with supply and demand.  On the other hand, it
> is not at all obvious why the price of basic cardboard packing cartons would be
> subject to appreciable fluctuation over the course of a single year (*i.e.*, the period of
> review).  And, contrary to Commerce's assertions in the Second Remand
> Determination, it is certainly not obvious why the price of basic cardboard packing
> cartons would be "*highly* susceptible" to fluctuation.

Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1322; *see generally id*., 35 CIT at ____, 783 F.
Supp. 2d at 1321-23.

[24]As Taian Ziyang II pointed out, the Domestic Producers had an obvious incentive to
affirmatively challenge the price quotes if they believed the price quotes to be inaccurate.
Presumably, if the price quotes did not fairly reflect the price of cardboard packing cartons

The record evidence favoring use of the Indian import statistics pales by comparison to the evidence supporting the domestic price quotes.  It is true that the import statistics are publicly available information.   And it is similarly undisputed that the import statistics are both contemporaneous and representative as well.  On the other hand, the record evidence on product specificity – the most important of Commerce's criteria – is damning.

In short, it is undisputed that the import statistics on the record are plagued by two serious infirmities.  First, because the scope of the tariff heading on which the statistics are based is very broad,[25] the values reflected in the import statistics are inflated by the inclusion of (unknown, potentially vast) quantities of more expensive gift, specialty, and other types of non-packing boxes that bear no resemblance to the basic cardboard packing cartons that the Chinese producers use to

_____

throughout the period of review, or seemed to be in some way distorted, the Domestic Producers would have been the first to say so.  Significantly, however, although the Domestic Producers placed the Indian import statistics on the record of this proceeding, they conspicuously never sought to present any evidence to suggest that the domestic price quotes on the record were manipulated or are in any way not representative of prices through the duration of the period of review.  Nor did the Domestic Producers ever make any such claims.  *See generally* Taian Ziyang II, 35 CIT at ____ n.24, 783 F. Supp. 2d at 1318 n.24.

Taian Ziyang II made the further point that the nature of the four domestic price quotes at issue here should serve to assuage, at least to some degree, any concerns about potential "manipulation."  If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a greater number of price quotes, and those price quotes would span the full duration of the period of review.  As Taian Ziyang II put it, "[v]iewed through this lens, the seeming imperfections in the price quotes are actually indicia of authenticity."  *See generally* Taian Ziyang II, 35 CIT at ____ n.24, 783 F. Supp. 2d at 1318 n.24.

[25]Indian tariff subheading 4819.1001 – the subheading for which Commerce has import statistics – covers gift, specialty, and many other types of non-packing boxes, in addition to the sort of plain cardboard packing cartons that the Chinese producers use.  *See* section III.B, *supra*; Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1144, 1149.

pack and ship garlic.  *See* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1149, 1151;

Taian Ziyang II, 35 CIT at ____, ____, ____, 783 F. Supp. 2d at 1314, 1323-24, 1326-27.[26]  And,

second, although garlic producers source their packing cartons domestically, the import statistics

include freight charges; and such charges – particularly charges for transportation by air – only

further distort (*i.e.*, inflate) the values reflected in the import statistics.  *See* Taian Ziyang I, 33 CIT

at ____ n.61, ____, ____, 637 F. Supp. 2d at 1148 n.61, 1149, 1150-51; Taian Ziyang II, 35 CIT at

____, ____, ____, 783 F. Supp. 2d at 1315, 1324-25, 1326-27.[27]

    Surveying the state of the administrative record (as outlined above), Taian Ziyang II put it

bluntly: "[I]n contrast to the Indian import statistics (which are admittedly 'imperfect'), there is no

affirmative evidence that the domestic price quotes are in any way 'imperfect.'"  *See* Taian Ziyang

II, 35 CIT at ____, 783 F. Supp. 2d at 1327.  In other words, while the record evidence indisputably

establishes that the values reflected in the Indian import statistics are (at least to some extent)

inflated and thus do not accurately reflect the cardboard packing cartons at issue, there is no record

---

    [26]That the values reflected in the import statistics are inflated by the inclusion of gift and specialty boxes is not in dispute.  There is no question that the basic cardboard packing cartons that the Chinese producers use are less expensive (and, in some instances, likely much less expensive) than the gift, specialty, and other non-packing boxes that are included in the import statistics. However, it is not possible to state with any precision the full extent of the distortion attributable to the more expensive boxes, because the record evidence on the quantity of such boxes reflected in the statistics (relative to the quantity of basic cardboard packing cartons) is simply inconclusive. *See generally* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1149-50; Taian Ziyang II, 35 CIT at ____, ____, 783 F. Supp. 2d at 1314-15, 1331.

    [27]*See generally* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1150-51 (questioning logic of assumption that, rather than sourcing basic cardboard packing cartons domestically, merchant would purchase cartons that were *imported* – much less *imported by air*); Taian Ziyang II, 35 CIT at ____ & n.19, 783 F. Supp. 2d at 1315 & n.19 (same).

evidence – absolutely none – to indicate that the domestic price quotes are in any way distorted or otherwise inaccurate.

The bottom line is that, to the extent that Commerce has a general policy that privileges the use of import statistics over price quotes due to concerns about the reliability of the latter, the agency's skepticism may well be justified, and – all other things being equal – its policy would be entitled to great weight and would likely carry the day. *See generally* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1145. But, given the facts of this specific case, all things are decidedly not equal.[28]

Commerce's determination on the valuation of cardboard packing cartons in *this action* must be grounded in the *evidence* on *this record*. And the evidence on domestic price quotes *versus* import statistics is not in equipoise. While neither the Domestic Producers nor Commerce ever adduced even an iota of actual evidence to impeach the accuracy and reliability of the domestic price quotes, Commerce itself has candidly conceded that the values reflected in the import statistics are inflated. *See*, *e.g.*, Second Remand Determination at 75 (admitting that "the [import statistics] do

---

[28]The situation would be quite different if the tariff subheading reflected in the import statistics were relatively narrow (and thus relatively "specific" to the input being valued), and if the effect of air freight charges could be reasonably estimated. Similarly, the situation would be different if there were any evidence at all on the record to undermine the reliability of the price quotes.

Here, however, Commerce itself has admitted that the import statistics include a broad range of products that are very much unlike the basic cardboard packing cartons here. And Commerce has also conceded that the import statistics are further distorted by air freight charges, though the extent of that distortion has not been established. In contrast, there is not even a shred of actual record evidence to cast doubt on the reliability of the domestic price quotes. On these specific facts, Commerce's policy preference for the use of import statistics over price quotes cannot prevail.

not perfectly represent the inputs of the GDLSK [Plaintiffs] because the Indian import data include

[1] specialty boxes, and [2] boxes transported by air").[29]

Under these circumstances, Commerce's decision in the Third Remand Determination to

value cardboard packing cartons using the domestic price quotes (rather than the Indian import

statistics) is plainly supported by substantial evidence.  Commerce's decision therefore must be

sustained.

## C.  Surrogate Value for Plastic Jars and Lids

In the Final Results in this case, Commerce valued plastic jars and lids using a surrogate

value derived from World Trade Atlas statistics for imports into India under two broad "basket"

provisions of the Indian tariff system – specifically, subheading 3923.3000 (covering "carboys,

bottles, flasks and similar plastic items") and subheading 3923.5000 (covering "stoppers, lids, caps

and other closures of plastics").  *See* Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1152.  As

with the Final Results on cardboard packing cartons, the Final Results on plastic jars and lids found

the use of Indian import statistics preferable to four domestic price quotes submitted by the GDLSK

---

[29]*See also* Second Remand Determination at 42 (acknowledging that trade intelligence data submitted by GDLSK Plaintiffs indicate that Indian import statistics for subheading 4819.1001 included "certain specialty packing products" and products "shipped by air"); *id*. at 45 (conceding that "the Indian import data . . . are less specific" than domestic price quotes); *id*. at 46 (acknowledging that "the data obtained through Indian import statistics . . . include specialty boxes, and boxes transported by air"); Issues and Decision Memorandum at 38-39 (admitting that "[Commerce's] analysis of the trade intelligence data provided by the GDLSK [Plaintiffs] indicated that there are many different types of boxes covered by [the Indian import statistics]," and that "different boxes for different purposes have entered India under [the tariff subheading used in the Indian import statistics]"); *id*. at 40 (acknowledging that Indian import statistics reflect cartons imported by air).

Plaintiffs, which were obtained from three different Indian vendors in three different cities and are for jars and lids comparable to those used by the Chinese producers here.  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1333.[30]

In rejecting the domestic price quotes, the Final Results cited concerns about the "public availability" of the price quotes, as well as their "contemporaneity," and their "representativeness." *See* <u>Taian Ziyang I</u>, 33 CIT at ____, 637 F. Supp. 2d at 1153-54.  <u>Taian Ziyang I</u> analyzed all of the grounds cited in the Final Results as a basis for rejecting the price quotes, and found each of them wanting.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1153-54.  <u>Taian Ziyang I</u> acknowledged that "[n]o doubt the various concerns . . . outlined in the Final Results diminish, at least to some limited extent, the utility of the domestic Indian price quotes for jars and lids."  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1154.  However, <u>Taian Ziyang I</u> concluded that the Final Results failed to adequately analyze the relative merits of the domestic price quotes and the seemingly much more seriously flawed Indian import statistics on which the Final Results relied, and therefore remanded the issue to Commerce for further consideration.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1157.

Much like the Second Remand Determination's treatment of cardboard packing cartons (discussed above), the Second Remand Determination's treatment of plastic jars and lids "[did] virtually nothing to advance the ball" on the use of Indian import statistics *versus* domestic price quotes.  *See* <u>Taian Ziyang II</u>, 35 CIT at ____, 783 F. Supp. 2d at 1336; *see generally id.*, 35 CIT at ____, 783 F. Supp. 2d at 1336-39.  Commerce continued to overstate the alleged problems with the

---

[30]The price quotes for plastic jars and lids are dated October 8, 2004, November 6, 2004, and November 22, 2004.  *See* <u>Taian Ziyang I</u>, 33 CIT at ____ n.64, 637 F. Supp. 2d at 1153 n.64.  Thus, all four price quotes post-date the period of review by at least 11 months.

domestic quotes and, at the same time, continued to downplay the obvious (and admitted) problems inherent in the Indian import statistics on which the agency continued to rely.  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1338-39.

Observing that the Second Remand Determination seemingly had once again chosen "*admittedly distorted* Indian import statistics over *potentially 'perfect'* price quotes," Taian Ziyang II held that the Second Remand Determination failed to adequately explain the agency's determination that the Indian import statistics constituted the "best available information" for use in calculating the surrogate value of plastic jars and lids, in light of the admitted infirmities in the import statistics.  *See* Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1339.  Taian Ziyang II similarly criticized Commerce for failing to adequately explain why the Indian import statistics were preferable to the domestic price quotes, the other source of information on the record.  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1339.  Taian Ziyang II further held that "the Second Remand Determination's conclusions that the Indian import statistics are 'sufficiently specific' and constitute the 'best available information' for use in valuing plastic jars and lids are unexplained, are not rational, and lack any sound basis in the existing administrative record, and therefore cannot be sustained."  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1339.  The issue was therefore remanded once again, and – as it had with cardboard packing cartons – Taian Ziyang II advised Commerce to use the remand wisely, because a fourth remand was unlikely.  *See id.*, 35 CIT at ____, 783 F. Supp. 2d at 1339.

In its Third Remand Determination, Commerce reversed course (as it did vis-a-vis the valuation of cardboard packing cartons), and used the domestic price quotes – rather than Indian

import statistics – to value plastic jars and lids.  Commerce explained:

> The Court found [in <u>Taian Ziyang II</u>] that Commerce had chosen "*admittedly distorted* Indian import statistics over *potentially 'perfect'* price quotes."  While the Department disagrees with this conclusion, the Department is cognizant of the Court's admonition that the Department is not likely to "get another bite of the apple on this issue."  Accordingly, . . . the Department has determined, under protest, to use the price quote surrogate values provided on the record by the plaintiffs during the underlying proceeding for this final remand redetermination.  Using these price quotes, . . . the surrogate value used for plastic jars and lids is 179.14 Rs/kg [rupees per kilogram].

Third Remand Determination at 3-4 (footnotes omitted); *see also id.* at 1 (stating that Commerce "has applied, under protest, the price quotes . . . to value . . . plastic jars and lids"); Pls.' Response Brief at 5-6 (stating that Third Remand Determination "accepted the Court's well-reasoned and clearly explained findings with respect to the available surrogate values" for plastic jars and lids); Def.'s Response Brief at 9-11 (explaining that "the Remand Results are consistent with the Court's holding" in <u>Taian Ziyang II</u>, and that "[i]n light of the Court's concerns about the import statistics, . . . Commerce reasonably adopted plaintiffs' approach and used the domestic price quotes").[31]

The Domestic Producers' attack on the Third Remand Determination's treatment of the valuation of plastic jars and lids parallels the Domestic Producers' challenge to the valuation of cardboard packing cartons.  Specifically, asserting that the Third Remand Determination "does not

---

[31]The quoted language from the Third Remand Determination – particularly the phrase "under protest" – can be read to suggest that <u>Taian Ziyang II</u> imposed an outcome or result on Commerce, and ordered the agency to use the domestic price quotes in valuing plastic jars and lids. That is not the case.  *See generally* n.17, *supra* (discussing same point in context of cardboard packing cartons); <u>Taian Ziyang II</u>, 35 CIT at ____, 783 F. Supp. 2d at 1339 (suggesting further development of record on remand, including additional "evidence concerning the domestic price quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate")); *see also* n.17, *supra* (noting *non sequitur* in Commerce's rationale).

include further analysis or justification for [Commerce's] reliance on the price quotes submitted by

the [GDLSK] Plaintiffs," the Domestic Producers contend that Commerce "has essentially (and

improperly) delegated [its] authority [to find facts in support of its determination] to the Court."

Def.-Ints.' Brief at 2-3.  The Domestic Producers conclude that the Third Remand Determination

fails to "provide a reasoned basis for [Commerce's] reliance on the price quotes submitted by the

Plaintiffs" and that the agency's use of the price quotes to value plastic jars and lids is not

"supported by substantial evidence."  *Id.*; *see also* Def.-Ints.' Reply Brief at 2-4.

Again, as outlined below, the Domestic Producers' failure to exhaust their administrative

remedies bars them from raising their arguments here.  In any event, their arguments have no

substantive merit.

### 1. Exhaustion of Administrative Remedies

The draft of the Third Remand Determination that Commerce provided to both the GDLSK

Plaintiffs and the Domestic Producers was "materially identical" to the final version of the Third

Remand Determination filed with the court, and thus reflected Commerce's decision to value plastic

jars and lids using the domestic price quotes (rather than the Indian import statistics).  *See* Def.'s

Response Brief at 9; *see also id.* at 5, Tab A ("Draft Results of Third Redetermination Pursuant to

Remand") at 3-4.  The Domestic Producers nevertheless failed to file any comments on the draft.

*See* Third Remand Determination at 3 (stating that Commerce received no comments on draft of

Third Remand Determination); Def.'s Response Brief at 4-5, 7, 8; Pls.' Response Brief at 2, 3.  The

Domestic Producers raised their objections to Commerce's use of the domestic price quotes for the

first time in their opening brief filed with the court commenting on the Third Remand

Determination.  *See* Def.-Ints.' Brief at 2-4; *see also* Pls.' Response Brief at 2.  The Domestic

Producers thus failed to properly exhaust their administrative remedies.  *See* Def.'s Response Brief

at 2, 6-9; Pls.' Response Brief at 2-5; *see generally* section III.B.1, *supra*.

      The Domestic Producers seek to avoid the requirement of exhaustion by relying on the same

legal theory that they advanced as to cardboard packing cartons.  The Domestic Producers argue,

in essence, that the exhaustion requirement has no application here, because – the Domestic

Producers contend – the gravamen of their objections is that the Third Remand Determination does

not satisfy the standard of review and does not comply with the terms of the remand set forth in

Taian Ziyang II.  *See* Def.-Ints.' Reply Brief at 2-3.  The Domestic Producers thus assert that, even

if they had filed no brief in this action, the court nonetheless would be required to analyze the Third

Remand Determination to ascertain whether it articulated a sufficient rationale for the use of

domestic price quotes in the valuation of plastic jars, and whether the determination to use the price

quotes is supported by substantial evidence.  As explained above, however, the Domestic Producers'

argument is in vain.  *See* n.18, *supra* (analyzing and rejecting same argument in context of cardboard

packing cartons).

      Thus, as with their concerns about the use of price quotes in the valuation of cardboard

packing cartons, the Domestic Producers' failure to raise their objections to the valuation of plastic

jars and lids at the administrative level precludes the Domestic Producers from raising the issue here.

2.  The Sufficiency of Commerce's Rationale

Even if the Domestic Producers' challenges to the Third Remand Determination's valuation of plastic jars and lids were not barred by the doctrine of exhaustion, they would not succeed on the merits.

The Domestic Producers' challenge to the sufficiency of Commerce's rationale for the use of price quotes in valuing plastic jars and lids is based on the same argument the Domestic Producers raised in attacking Commerce's rationale on the valuation of cardboard packing cartons. Specifically, the Domestic Producers assert that the Third Remand Determination lacks "a reasoned basis for [the agency's] reliance on the price quotes submitted by the [GDLSK] Plaintiffs" in lieu of the Indian import statistics used in the agency's previous determinations.  Def.-Ints.' Brief at 3; *see generally id*. at 2-4; Def.-Ints.' Reply Brief at 2-4.

As explained above, however, while the Third Remand Determination's rather "cryptic" explanation of Commerce's rationale "is hardly a model worthy of retention," it is sufficient under the law.  *See* section III.B.2, *supra* (analyzing challenge to adequacy of agency's stated rationale for valuation of cardboard packing cartons); New Jersey Zinc Co. v. FERC, 843 F.2d 1497, 1500-01 (D.C. Cir. 1988) (Bader Ginsburg, J.).

Although the Third Remand Determination does not expressly state that Commerce is (in effect) adopting the rationale suggested by Taian Ziyang I and Taian Ziyang II, Commerce's intent is clear – particularly when the statement of rationale in the Third Remand Determination is read in light of the administrative record as a whole, and the opinions of the court (which the Third Remand Determination references).  *See* n.20, *supra* (explaining that, in attempting to discern

agency's path of decisionmaking, court need not confine itself solely to text of agency's stated rationale); *see*, *e.g.*, Wheatland Tube, 161 F.3d at 1370 (stating that "[a]n *explicit* explanation is not necessary . . . where the agency's decisional path is reasonably discernible") (emphasis added)[32]; *see also* Pls.' Response Brief at 5-6 (stating that Third Remand Determination "accepted the Court's well-reasoned and clearly explained findings with respect to the available surrogate values" for plastic jars and lids); Def.'s Response Brief at 9-11 (same).

Significantly, the Domestic Producers do not claim to be "in the dark" concerning the bases for Commerce's decision to use the domestic price quotes to value plastic jars and lids in the Third Remand Determination. Their challenge to the sufficiency of Commerce's rationale is thus purely formalistic. Under these circumstances, a fourth remand would be a waste of the time and resources of all concerned. The Domestic Producers' arguments contesting Commerce's rationale for use of the domestic price quotes must therefore be rejected.

3.   The Substantiality of the Evidence

Just as the Domestic Producers have argued that the decision in the Third Remand Determination to use price quotes to value cardboard packing cartons is not supported by substantial evidence, they level the same charge at Commerce's reliance on price quotes in valuing plastic jars and lids. *See* Def.-Ints.' Brief at 3-4; Def.-Ints.' Reply Brief at 2, 4. The argument is no more successful here. *See generally* Pls.' Response Brief at 5-6; Def.'s Response Brief at 9-11.

---

[32]*See also* Nucor Corp., 414 F.3d at 1339 (stating that, "[w]here an agency has not made a particular determination *explicitly*, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'") (*quoting* Ceramica Regiomontana, 810 F.2d at 1139, *quoting* Bowman Transportation, 419 U.S. at 286) (emphasis added).

As outlined below, and as set forth at length and in painstaking detail in Taian Ziyang I and Taian Ziyang II, the record evidence solidly favors use of the price quotes.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1152-57 (analyzing merits of domestic price quotes *versus* Indian import statistics for valuation of plastic jars and lids); Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1333-39 (same).

As discussed above, Taian Ziyang II explained that – of the five criteria set forth in Policy Bulletin 04.1 – "product specificity" logically must be the most important.  *See* Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1330.[33]  And it is undisputed that, as discussed in Taian Ziyang I and Taian Ziyang II, the four domestic price quotes on the record of this proceeding are highly "specific to the input in question" – that is, the plastic jars and lids used by the Chinese producers here.  *See* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1155, 1157; Taian Ziyang II, 35 CIT at ____, ____, 783 F. Supp. 2d at 1333-34, 1336.[34]

In its determinations in this proceeding prior to the Third Remand Determination, Commerce's concerns focused on the "contemporaneity," "representativeness," and "public availability" of the price quotes.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1153-54; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1334.  But, as documented in Taian Ziyang I

---

[33]*See generally* section III.B.3, *supra* (discussing extreme example which illustrates overriding significance of "product specificity").

[34]Although there was some confusion concerning the number of price quotes for plastic jars and lids submitted by the GDLSK Plaintiffs, the record establishes that there are, in fact, a total of *four* price quotes from *three* Indian vendors.  *See* Taian Ziyang I, 33 CIT at ____ & n.64, 637 F. Supp. 2d at 1152-53 & n.64; Taian Ziyang II, 35 CIT at ____ nn.45-46, 783 F. Supp. 2d at 1334 nn.45-46.

and Taian Ziyang II, those concerns had no evidentiary foundation in the administrative record of this proceeding.

As to Commerce's "contemporaneity" and "representativeness" criteria, it is true that the four domestic price quotes fall well outside the period of review. *See* Taian Ziyang I, 33 CIT at ____ & n.64, 637 F. Supp. 2d at 1153-54 & n.64; Taian Ziyang II, 35 CIT at ____ & n.46, 783 F. Supp. 2d at 1334 & n.46. However, the policy considerations that underpin the contemporaneity and representativeness criteria go to whether the preferred pricing information accurately reflects prices for the input (here, plastic jars and lids) during the period of review.

In the case at bar, Commerce was concerned that, because the price quotes were obtained well after the period of review, they might not accurately reflect actual prices during the period of review; and, in addition, Commerce was concerned that price quotes from a limited period (rather than a full year, the length of the period of review) might be distorted (and therefore unreliable) due to "temporary market fluctuations." *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1153-54; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1334-35. As Taian Ziyang I and Taian Ziyang II noted, however, there is no evidence whatsoever on the record of this proceeding to indicate that prices for plastic jars and lids are subject to any appreciable fluctuation. *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1154; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1335.[35] In other words, there is nothing on the record that even intimates that the price quotes do not accurately represent prices for jars and lids during the period of review here. The concerns

---

[35]For the reasons discussed above, there is no apparent reason to expect that plastic jars and lids (any more than cardboard packing cartons) would be susceptible to significant price fluctuations. *See* n.23, *supra*.

about the contemporaneity and representativeness of data that are reflected in Policy Bulletin 04.1 are entirely reasonable, as a theoretical matter.  But, in this particular case, the record evidence on the price quotes for plastic jars and lids does not bear out those concerns.

The record is no less clear on the matter of "public availability."  As discussed above, Commerce's concern about information that is not publicly available is the risk of manipulation. *See* section III.B.3, *supra* (explaining policy basis for "public availability" criterion).  But the record here includes no evidence that can be read even to suggest that the price quotes for jars and lids are in any way the product of manipulation or collusion.  *See* Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1153; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1334.[36]

The record evidence supporting use of the Indian import statistics is not nearly as strong as that favoring the price quotes.  The import statistics are publicly available, as well as contemporaneous and representative.  But the evidence on product specificity – the most important of Commerce's criteria – tells a very different story.

---

[36]The Domestic Producers had a clear incentive to affirmatively challenge the price quotes if the Domestic Producers believed them to be inaccurate.  Presumably, if the price quotes did not fairly represent prices throughout the period of review, or if they appeared to be in some way distorted or manipulated, the Domestic Producers would have been the first to say so.  It is therefore telling that, although the Domestic Producers placed the Indian import statistics on the record here, they have never sought to present any evidence to cast doubt on the accuracy of the price quotes. Nor have the Domestic Producers ever claimed that the price quotes are not accurate.  *See* Taian Ziyang II, 35 CIT at ____ n.44, ____ n.50, 783 F. Supp. 2d at 1333 n.44, 1337 n.50.

Moreover, the nature of the four domestic price quotes should lay to rest any concerns about potential "manipulation."  If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a greater number of price quotes, and those price quotes would be dated within the period of review and would span the full duration of that period.  Viewed through this perspective, the seeming flaws in the price quotes are actually indicia of authenticity and reliability.  *See* Taian Ziyang II, 35 CIT at ____ n.44, ____ n.50, 783 F. Supp. 2d at 1333 n.44, 1337 n.50.

Like the import statistics previously used to value cardboard packing cartons, the import statistics that the Final Results used to value plastic jars and lids suffer from two critical defects. The Indian import statistics for plastic jars and lids are much less product-specific than the domestic price quotes, both because the import statistics include a very broad range of "specialty" and other plastic products that bear no resemblance to the simple, basic plastic jars at issue in this case,[37] and because (like the import statistics for cardboard packing cartons) they include charges for air freight.[38]   *See* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1152-53, 1155-56 (discussing inflation attributable to highly diverse group of products captured by import statistics); *id.*, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1152-53, 1155, 1156 (discussing inflation attributable to air freight charges); Taian Ziyang II, 35 CIT at ____, ____, ____ & n.51, 783 F. Supp. 2d at 1333, 1336, 1337-38 & n.51 (discussing inflation attributable to highly diverse group of products captured by import statistics); *id.*, 35 CIT at ____, ____ & n.51, 783 F. Supp. 2d at 1336, 1338 & n.51 (discussing inflation attributable to air freight charges).[39]

---

[37]As explained above, Indian tariff subheadings 3923.3000 and 3923.5000 – the subheadings for which Commerce has import statistics – cover many different types of "specialty" and other plastic products, in addition to the sort of simple, basic plastic jars that the Chinese producers use. *See* Taian Ziyang I, 33 CIT at ____, ____, 637 F. Supp. 2d at 1152, 1155-56; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1333.

[38]*See generally* Taian Ziyang I, 33 CIT at        , 637 F. Supp. 2d at 1156-57 (questioning logic of assumption that merchant would purchase cartons that were *imported* – much less *imported by air*).

[39]There is no dispute that the values reflected in the import statistics are inflated by "specialty" and other plastic products that are very different from (and more elaborate than) the simple, basic plastic jars at issue here.  There is no dispute that the plastic jars and lids that the Chinese producers use are less expensive (and, in some instances, likely much less expensive) than other plastic products that are included in the import statistics.  However, it is not possible to state with any precision the full extent of the distortion attributable to the other plastic products, because

In its Second Remand Determination, Commerce unequivocally admitted that the Indian import statistics reflect inflated values as a surrogate for the plastic jars and lids at issue here, both because the import statistics "include a broad range of products that are different from the plastic jars used to pack garlic," and because the import statistics "include[] products that, unlike those the GDLSK [Plaintiffs] used, were shipped by air." *See* Second Remand Determination at 77; *see also id.* at 49-50 (same).[40]   As such, the facts here are straightforward, compelling, and uncontroverted. While the record evidence indisputably establishes that the values reflected in the Indian import statistics are (at least to some extent) inflated and thus do not accurately reflect the basic plastic jars and lids at issue, there is no record evidence – absolutely none – to indicate that the domestic price quotes are in any way distorted or otherwise inaccurate.

Under these circumstances, Commerce's decision in the Third Remand Determination to value plastic jars and lids using the domestic price quotes (rather than Indian import statistics) is clearly supported by substantial evidence.  That decision therefore must be sustained.

---

the record evidence on the quantity of such products reflected in the statistics (relative to the quantity of basic plastic jars) is simply inconclusive. *See generally* Taian Ziyang II, 35 CIT at \_\_\_\_, \_\_\_\_, 783 F. Supp. 2d at 1337-38, 1339.

[40]*See also* Issues and Decision Memorandum at 41 (noting GDLSK Plaintiffs' arguments that, due to "basket" nature of the tariff subheadings reflected in Indian import statistics at issue, import statistics include "specialty products such as hair cosmetics and centrifuge tubes that do not resemble the plastic jars and lids" used to pack garlic, and that Indian import statistics include air freight charges); *id.* at 43 (conceding that Indian import statistics include products imported by air).

## IV.  <u>**Conclusion**</u>

For all the reasons set forth above, Commerce's Third Remand Determination must be sustained.  Judgment will enter accordingly.

    /s/ Delissa A. Ridgway
Delissa A. Ridgway
Judge

Decided:  June 24, 2013
          New York, New York